THE PEOPLE, *ex rel.* Daniel A. Bullard, *vs.* THE CONTRACT-ING BOARD.

Subdivision 3 of section 10 of chapter 329 of the laws of 1854 must be construed to mean that the terms of the contract into which a successful bidder is required to enter, shall be prescribed by the contracting board not *after* the bidding and before the execution of the contract itself, but *before* the bidding; so that the bidder may see what kind of a contract he is to execute, and perform, and may bid accordingly.

Where proposals for work, made to the contracting board in pursuance of an advertisement published by the board, are on their face palpably fraudulent, and calculated to defraud the state, the board is not bound to accept the bid, but may, in its discretion, disregard and reject the same.

And after the contracting board has, by resolution, rejected such a bid, a mandamus will not be issued, to compel the board to award a contract to the bidder.

THIS is an appeal from an order made at a special term, granting a peremptory mandamus against the defendants. On the 7th of December, 1860, an order was granted at the Albany special term, that the defendants show cause at a special term, to be held at Ballston Spa on the 11th of the same month, why a peremptory mandamus should not issue against them, to compel them to award a contract to the relator. Upon the hearing of the motion it was shown by affidavits that the defendants, in pursuance of law, advertised for seal-

ed proposals for the rebuilding of the Bassett lock on Champlain canal. By the terms of the advertisement, it was required that all propositions must *be for a sum certain* as to the *price* to be paid; that *a price for every kind of work* included in such proposal must be distinctly and plainly inserted; that a bond in the penalty of $5000, with sufficient sureties, must be excuted; that the bond, certificate and proposals must be complete *in every respect* before being received; that fifteen per cent on the work done would be reserved until the contract was fulfilled; that the *prices* in the contract would be considered as including the expenses of all materials and work; that the persons to whom the contract was awarded would be required to enter into a contract to perform the work on the terms prescribed; that the plans, maps, specifications, *forms of contract,* and all other necessary papers with which proposers would be required to comply, would be ready for examination at the engineer's office, and that all proposals where the figures used were of doubtful construction would not be canvassed.

The relator under those offers from the defendants filed proposals for the work, and the defendants *the next day after the order to show cause in this case was served,* rejected his bid; and at the same time passed the following resolutions: "Whereas the proposals of Daniel A. Bullard, the second lowest for rebuilding the Bassett lock, and of Isaac Quackenbush, the lowest for raising the banks of the Champlain canal, are in the opinion of this board deceptive and fraudulent, and by the appearance of each of the said proposals it seems evident that it was the intention of the parties making them to perform that portion of the work which, according to the common course of things, would be done first, and for which they have each bid excessive prices, and with the profits obtained, paying the forfeiture on the bond, abandoning the fifteen per cent retained, and leaving the work half performed, secure to themselves great benefit with much loss and work not accomplished to the state; therefore, resolved, that the

proposals of the aforesaid Bullard and Quackenbush be and the same are hereby rejected, they having rendered their bonds insecure by the shape of their proposals, and the state thereby not having 'adequate security as required by chapter 329, laws of 1854.'"

The defendants believed the bid fraudulent and deceptive. They saw that for the work, which in the order of things would have to be performed first, the relator had bid a price twenty times greater than the work was worth, and for other work he had not bid a thousandth of what it was really worth. They saw that the two first items, 4000 cubic yards of earth excavation at $3.50 per yard, and 400 cubic yards of rock blasting at $6, would amount to $16,400, while all else was proposed to be done for $210. This work was only estimated to be worth $1600 by the engineers ; and they believed that under these proposals the contractor would be tempted to forfeit the 15 per cent kept back on the contract, and pay the 10 per cent liquidated damages mentioned in the bond, and net $10,679.

*C. G. Myers,* (attorney general,) for the appellants.    I. The relator acquires no such vested legal right by proposing for a contract as to entitle him to enforce the defendants entering into a contract with him, by mandamus. If the officers having the duty of determining to whom amongst several competitors the contract is to be awarded act improperly, the remedy must be sought by the government against its officer.

II. The defendants, at the time the order was served, had not awarded the contract or acted upon the proposal of the relator. The order was therefore premature.

III. The relator's bid is fraudulent upon its face, and was made with the evident intent to perform that portion of the work which would have to be done first, for which he has bid excessive prices; and then to abandon it. Such a proposal should not have been entertained by the board; it was not a bid contemplated by the statute, but bore upon its face un-

mistakable evidence of being an ingenius trick, contrived to cheat the state.    (1.) The law provides that the contract shall be awarded to the .lowest bidder giving adequate security. (2.) The statute prescribes the form of the bond to be given. (3.) It will be seen by computation(*a*) that the bond provided for by the statute would be no security whatever for the performance of the work.    (4.) The contracting board could not protect the state by any provision in the contract, as to payments.    The only provisions they are authorized to make as to payments is for the retention of fifteen per cent on the estimates; the payments are made by the canal commissioner in charge of the division, on the estimates of the engineer. This is provided by statute.

IV. The statute is to be construed with a view of accomplishing the purpose for which it was enacted.    A mere literal compliance when the manifest purpose is an evasion does not satisfy the statute.

*L. Tremain,* for the relator.    I. The argument of the appellants assumes what is not proven in the papers, that the

(*a*) STATEMENT OF BULLARD'S PROPOSITION.

Assuming that the contractor excavates the earth and the rock with blasting, then forfeits the fifteen per cent retained on estimates and pays the ten per cent according to the provisions of the bond,

| | | |
|---|---|---:|
| 4000 cubic yards of earth excavation at $3.50, . . . | | $14,000 00 |
| 400 cubic yards of excavation of rock with blasting at $6, | | 2,400 00 |
| | | $16,400 00 |

*Deduct.*

| | | |
|---|---|---:|
| 15 per cent on $16,400, amount retained on estimates, | $2,460 | |
| 10 "  " on $16,610, whole amount of proposal, . | 1,661— | 4,121 00 |
| Amount contrator would receive, . · . · . . . | | $12,279 00 |
| 10 per cent on materials, . . . . . . . | | 727 60 |
| | | $11,551 00 |

*Actual cost of this work.*

| | | | |
|---|---|---|---:|
| Eng. est. 4000 cubic yards excavation of earth at 20c. | $800 | | |
| 400 "  "  " rock at $2, . | 800— | 1,600 00 | |
| Amount contractors would net, . . . . . | | $10,679 00 | |

work done must be paid for as the work progresses.    The papers do not even show any usage on that subject.

II.  But a conclusive answer to this whole objection exists in this :  The canal board may direct the insertion, in *any* contract, of any provision to ensure the faithful execution of the contract.    (*Laws of* 1854, *ch.* 329, § 9, *sub.* 6.)    It will be presumed that public officers will do their duty.    The members of the contracting board constitute one half of the canal board.    It is competent, therefore, to require a contract postponing the payment for any of this work until the whole work is done, or any other provision fully securing the state from loss.    This removes every particle of excuse for attempting to exercise the illegal power of rejecting one bid, and giving the contract to a higher bidder.    The exercise of such a power proves a dead loss to the state in this case, and defeats the manifest policy of the constitution and law requiring the contract to be let to the lowest bidder.

There is no provision of law requiring payment for work on the canal, to be made as the work is done.    All that is left to the contract ; and the contract, in this respect, is regulated and moulded by the public officers of the state.

There is a provision, applicable only to contracts for keeping the canals in ordinary repairs, *authorizing* but not requiring canal commissioners to pay monthly.    (*Laws of* 185.7, *chap.* 105, § 3.)

III.  By reference to the following laws it will be observed that, in ascertaining who is the lowest bidder, we are to use the estimates of the quantities of work made by the engineers and exhibited to the contractors.    (*Laws of* 1850, *ch.* 377, § 9.    *Laws of* 1854, *ch.* 329, §§ 8, 9 *and* 14.)

GOULD, J.   A careful reading of the different parts of the 10th section of chapter 329 of the laws of 1854, (*Sess. L.* 1854, 696, 7,) has entirely satisfied me that its provisions were not fully appreciated on the argument.    Subdivision 3 of that section must be construed to mean that the *terms of the*

*contract* (into which the successful bidder would be required to enter) should be *"prescribed* by the contracting board," *not,* as was claimed on the argument, *after the bidding and before the execution of the contract itself,* but *before the bidding;* so that the bidder might see what kind of a contract he was to execute and perform, and might bid accordingly. And such was manifestly the action of the contracting board in this case. For, though there was some contradiction on this point, between counsel on the argument, the advertised proposals state that, among the papers to be furnished by the board to all persons *wishing to bid,* were "forms of contract;" so that, after having furnished such a form of contract, the board had no power to alter it so as to *"provide for the security of the state,"* in the emergency of any unusual manner of bidding. If the bid was such that the state could not be secure, under a contract made in *that prescribed* form, the board could not make it so.

Again, although the *form* of that prescribed contract is omitted from the papers, yet the 5th subdivision of the same section says that every such contract *shall* contain a "provision that *fifteen per cent* of the amount of any work done, &c. at the contract price thereof, *shall be reserved* by the canal commissioner *until the whole work* shall be completed"—a clause carrying with it the necessary implication that *all but fifteen per cent* was to be paid *before* the work was completed, and fairly referring every one to the very well known fact that all such contracts provide for *monthly* estimates and payments. The same division states that the engineer, certifying the amount of work, &c. shall certify the deduction of this 15 per cent, "*and the net* amount to be paid" for such work, &c. And the proposals for this very bid contain this identical clause of the section, providing for retaining the 15 per cent; leading plainly to the conclusion that the forms of contract furnished to these bidders *did* contain a provision for the payment of *all but fifteen per cent before* the work was done.

And it would be indeed unusual and purposeless for a contract to contain any such provision, without *prescribing* a *fixed time,* or *times,* for such payments as were to be made *during the progress* of the work. And thus we are driven back to the necessity of knowing that *stated times* for such payments *were fixed* in the contract; and that permits but little ground for holding it doubtful that such payments were to be monthly, on monthly estimates.

The 3d division, above referred to, provides for just the bond which is before us, (furnished by the board,) with its precise condition that, upon any failure fully and faithfully to perform the contract, (*in the aggregate* or in detail,) the damages to be recovered were *liquidated* at 10 per cent of the engineer's estimate; and it further provides that, upon the prosecution of such bond, the recovery is to be for "*the liquidated damages specified in the condition thereof.*" The statute adds, "and *all damages* sustained by the state, by the non-performance of the said contract, or any part thereof." But, with all deference to legislative omnipotence, is there not a legal impediment to recovering liquidated damages and unliquidated damages for *precisely the same* breach, or breaches? The precise and fixed rule must prevail over the loose and indeterminate; and the liquidated damages must remain the true amount of recovery, especially when the bond is *not* conditioned for these, "*all* damages," but only for the liquidated damages.

If these views be sound, it must be entirely plain that a bid so palpably open for a gross imposition on the state, should be treated as this was by the board. If no fraud were intended, the temptation thereto is too strong to deserve encouragement from the courts. Stopping the work, after the first parts (the earth excavation and rock blasting) had been done, losing the 15 per cent, and paying the 10 per cent, would still leave the state defrauded of some $10,000 or $12,000. Nothing but the clearest right should call on us

to issue a mandamus in such a case. And in my view no such clear right exists in this case.

I should reverse the order of the special term, and deny the mandamus.

PECKHAM, J. Irrespective of the question of the power of the board to protect the interests of the state by the contract to be entered into by the relator, by withholding the payments beyond the fifteen per cent, until the work should be all performed, I am of opinion that the board was not bound to accept a proposal like the one in question. Its purpose could not be other than fraudulent, and it would rarely fail to result in a fraud upon the state. It may be safely said that a proposition so utterly out of proportion as this, contains some purposed fraudulent advantage to the proposer not always apparent, and therefore the more dangerous. I do not think a board should even entertain a proposition like the one in question, under circumstances like these. Suppose the contract be fully and thoroughly performed, it by no means follows that the state is not defrauded. Here is a proposition to make some 400 yards of rock excavation with blasting estimated by the engineer to be fairly worth 25 cents a yard, for $6 per yard. This, it will be observed, is a mere estimate by the engineer, as accurate as may be, of the amount of rock excavation to be done. Suppose it turns out, in executing the contract, that instead of being 400 yards of rock excavation there should be 2000. The state of course would be seriously defrauded. Such a gross disproportion in prices leads to strife and contest as to the amount of work of the peculiar character so overcharged. It will be sought to be magnified. The inducements to magnify it will be strong; the temptation to wrong will be quite too strong. That the amount of such work would be larger than stated in the estimate, might be generally safely calculated. At best it is but an estimate, and when there is a departure therefrom, an error or a mistake in judgment, or in making the experi-

ment on which to base the estimate, we may safely calculate that with such inducements the error would almost universally be to the benefit of the contractor. Though the engineer may make the estimate in the best possible faith, which I should not ordinarily be disposed to question, still that does not deprive individuals of the right of making examinations and estimates, and the vigilance stimulated by great interest would be very apt to obtain the more accurate knowledge. The state would always be the loser. The estimates of course cannot be accurate; they will always vary; and it is entirely safe to say that the state will always lose by the variance. Such a proposal also leads to suspicion of probable connivance between the contractor and the engineer who makes the estimate. It certainly offers strong temptation for such connivance. In fact, such a disproportion in price leads and incites to all sorts of frauds, and should not receive the least encouragement from the courts. The proposition is a clear fraud upon the law. This principle of course gives no sanction to rejecting a bid unless the disproportion be broad and palpable—entirely and flagrantly transparent. Exhorbitant prices does not express the idea. They are fraudulent prices. Nor would it apply with great force to a contract where the thing to be done was clearly and absolutely known. But a case like the one at bar is the peculiarly appropriate field for the exercise of this species of management, and the state the true subject.

It seems that these fraudulently high prices are all upon that part of the work first to be done. Suppose the work, after being partly performed, should for any cause be suspended, when the contractor, to that time, had received some twenty-five times what his work was worth. Such suspensions have occurred from unavoidable causes. Would the contractor's sense of justice prompt him to refund?

Though the estimates be erroneous, as they cannot be entirely accurate, if the proposals bear a reasonable approach to the value of the different kinds of work to be done, no mate-

rial injury results to either party. But a proposal like this makes it a lottery, and as between an individual and the state, the latter, it may be safely predicted, will generally if not universally draw a blank. It is a mere lottery or a bet, and the statutes of our state do not give countenance to lotteries or to betting and gaming. Why is this very gross and glaring disparity made in prices for different kinds of work, in proposals ? Obviously because the proposer believes, and no doubt has reliable reasons for believing, there is or there will be more of the high priced work than the estimate presents, or less of the low, and such a proposition should operate as a direct notice to the board of an unfair advantage sought to be taken. If a public officer should sanction it he would do so after full notice of the intended improper advantage, and therefore would be virtually a participator in accomplishing the fraud. It is alleged on the one side and denied on the other, that the board has accepted such bids before. But no practice of the board could render the acceptance of such proposals proper, however it might encourage their being made. It seems that this view of the case was not presented or considered by the justice at special term, or he would probably have arrived at a different result. The mandamus should be denied.

Hogeboom, J., concurred in reversing the order of the special term and denying the mandamus, for the reason that the bid was, on its face, palpably fraudulent; and that upon that ground the board had a right to disregard it.

Order reversed.

[Albany General Term, March 4, 1861. *Gould, Hogeboom* and *Peckham,* Justices.]